**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTHWEST BANCORPORATION OF | ) | Case No. 21-08123 |
| ILLINOIS, INC., | ) | |
| | ) | Hon. Carol A. Doyle |
| Debtor. | ) | |

**DISCLOSURE STATEMENT FOR AMENDED JOINT CHAPTER 11 PLAN OF
REORGANIZATION PROPOSED BY THE CHAPTER 11 TRUSTEE AND
AMERINATIONAL COMMUNITY SERVICES, LLC**

Catherine L. Steege
Landon S. Raiford
William A. Williams
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, Illinois 60654
(312) 222-9350
csteege@jenner.com
lraiford@jenner.com

*Counsel for Chapter 11 Trustee*

Jay Jaffe
Elizabeth Little
FAEGRE DRINKER BIDDLE &
REATH LLP
300 N. Meridian Street
Indianapolis, Indiana 46204
(317) 569-9600
jay.jaffe@faegredrinker.com
elizabeth.little@faegredrinker.com

*Counsel for AmeriNational Community
Services, LLC*

Dated:  February 22, 2023

**DISCLAIMER**

CATHERINE STEEGE, THE CHAPTER 11 TRUSTEE, AND AMERINATIONAL COMMUNITY SERVICES, INC. BELIEVE THAT THE AMENDED JOINT PLAN OF REORGANIZATION, ATTACHED AS <u>EXHIBIT 1</u> TO THIS DISCLOSURE STATEMENT, IS IN THE BEST INTERESTS OF CREDITORS AND URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT THE AMENDED PLAN.

THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS APPROVED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES FOR OR AGAINST THE AMENDED PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, IN ADDITION TO OTHER INFORMATION, ONLY A SUMMARY OF THE AMENDED PLAN AND IS NOT INTENDED TO REPLACE A DETAILED REVIEW AND ANALYSIS OF THE AMENDED PLAN. ALL HOLDERS OF CLAIMS ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE AMENDED PLAN AND THE EXHIBITS TO THE AMENDED PLAN AND THIS ENTIRE DISCLOSURE STATEMENT CAREFULLY BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE AMENDED PLAN. IN THE EVENT OF A CONFLICT BETWEEN THE AMENDED PLAN AND THIS DISCLOSURE STATEMENT, THE PROVISIONS OF THE AMENDED PLAN WILL GOVERN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF. THE DELIVERY OF THIS DISCLOSURE STATEMENT DOES NOT IMPLY THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF, AND THE AMENDED PLAN PROPONENTS DO NOT ASSUME ANY OBLIGATION TO UPDATE THIS DISCLOSURE STATEMENT FOR EVENTS OR INFORMATION ARISING AFTER THE DATE HEREOF.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. FOR THAT REASON, AND BECAUSE OF THE IMPOSSIBILITY OF MAKING ASSUMPTIONS, ESTIMATES, AND PROJECTIONS INTO THE FUTURE WITH CERTAINTY, THE AMENDED PLAN PROPONENTS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS COMPLETE AND ACCURATE, ALTHOUGH REASONABLE EFFORT HAS BEEN MADE TO PRESENT COMPLETE AND ACCURATE INFORMATION.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE AMENDED PLAN.

HOLDERS OF CLAIMS SHALL NOT CONSTRUE THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, FINANCIAL, OR TAX ADVICE. ALL

HOLDERS OF CLAIMS SHOULD CONSULT WITH THEIR OWN ADVISORS AS TO ANY MATTERS CONCERNING THE AMENDED PLAN, ITS SOLICITATION, AND THE TRANSACTIONS, TREATMENT, AND DISTRIBUTIONS CONTEMPLATED BY THE AMENDED PLAN.

THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED AS AN ADMISSION OR STIPULATION AS TO ANY CONTESTED MATTER, ADVERSARY PROCEEDING, CLAIM, OR OTHER ACTION OR THREATENED ACTION BUT AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

IF THE AMENDED PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE AMENDED PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE AMENDED PLAN) WILL BE BOUND BY THE TERMS OF THE AMENDED PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

# TABLE OF CONTENTS

DISCLAIMER ......................................................................................................................... i

I. INTRODUCTION. ......................................................................................................1

II. OVERVIEW OF THE AMENDED PLAN AND SUMMARY OF
DISTRIBUTIONS. .......................................................................................1

III. VOTING AND CONFIRMATION PROCEDURES AND DEADLINES. ......................3

IV. QUESTIONS AND ANSWERS REGARDING THE CHAPTER 11 AND
CONFIRMATION PROCESS. ..........................................................................5

A. What is chapter 11? .....................................................................................5

B. Why are the Amended Plan Proponents sending me this Disclosure
Statement? ...............................................................................................5

C. What is the Confirmation Hearing and what is its purpose? ........................5

D. What do you mean when you refer to "Confirmation" and "Effective Date"? ...........6

E. Will the Debtor receive a discharge and will there be any other be any
releases granted to parties other than the Debtor as part of the Amended Plan? .........6

V. THE CHAPTER 11 CASE. ..........................................................................................6

A. The Debtor's Business And Ownership. .......................................................6

B. The Debtor's Scheduled Assets And Liabilities And Operating Reports. ....................6

C. Events Leading Up To The Chapter 11 Filing. .............................................7

D. Administration Of The Chapter 11 Case. .....................................................7

1. First Day Motions And Formation Of The Committee. .....................7

2. The Sale Motion. .............................................................................7

3. The Chapter 11 Trustee's Administration. .......................................8

VI. SUMMARY OF THE AMENDED PLAN. ..................................................................8

A. Treatment of Unclassified Claims. ...............................................................9

1. Administrative Claims. ....................................................................9

2. Professional Claims. .......................................................................9

    3.    Priority Tax Claims. ..................................................................................9

    4.    U.S. Trustee Fees. ................................................................................10

  B.  Treatment of Classified Claims. .................................................................10

    1.    Class 1 – Other Priority Claims. ..........................................................10

    2.    Class 2 – General Unsecured Claims. ...................................................11

    3.    Class 3 – Senior TruPS Claims. ...........................................................11

    4.    Class 4 – Junior TruPS Claims. ............................................................12

    5.    Class 5 – Interests. ...............................................................................13

  C.  Conditions To The Effectiveness Of The Amended Plan. ..........................14

  D.  Provisions Governing Distribution To Holders of Allowed Claims. ..........14

    1.    Distribution Only to Holders of Allowed Claims. .................................14

    2.    Indenture Trustee Fees. ........................................................................14

    3.    Delivery of Distributions in General. ....................................................15

    4.    Minimum Distributions. ........................................................................15

    5.    Undeliverable Distributions and Unclaimed Property. ..........................15

    6.    Manner of Payment. .............................................................................15

    7.    Compliance with Tax Requirements. .....................................................15

    8.    Allocations. ...........................................................................................16

    9.    No Post-Petition Interest On Claims. ...................................................16

    10.  Setoffs and Recoupment by Trustee or Reorganized Debtor. ...............16

VII.     MEANS FOR IMPLEMENTATION OF THE AMENDED PLAN AND
FINANCIAL INFORMATION. ............................................................................16

  A.  Reorganization Transaction. ......................................................................16

  B.  Sale Transaction. .......................................................................................17

VIII.   EFFECTS OF AMENDED PLAN CONFIRMATION AND DISCHARGE ..........17

  A.  Discharge. .................................................................................................17

B.   Vesting of Assets. ..............................................................................17

C.   Exculpation and Limitation of Liability. ..............................................17

IX.   RISK FACTORS. .........................................................................................18

A.   Certain Bankruptcy Law Considerations. ...............................................18

1.   Parties in Interest May Object to the Amended Plan's Classification of Claims and Interests. ....................................................18

2.   Failure to Satisfy Vote Requirements. ...............................................19

3.   The Amended Plan Proponents May Not Be Able to Secure Confirmation of the Amended Plan. ....................................................19

4.   Nonconsensual Confirmation. ...........................................................20

5.   The Trustee May Object to the Amount or Classification of a Claim...............20

6.   Risk of Non-Occurrence of the Effective Date .................................20

B.   Necessary Governmental Approvals May Not Be Granted. .....................20

C.   Failure to Identify Litigation Claims or Projected Objections ................20

D.   No Waiver of Right to Object or Right to Recover Transfers and Assets .................21

X.   BEST INTERESTS TEST ...........................................................................21

XI.   CERTAIN FEDERAL INCOME TAX CONSIDERATIONS..........................21

A.   Tax Consequences To Creditors ...............................................................22

B.   Tax Consequences To The Debtor. ...........................................................23

1.   Cancellation of Debt Income. ............................................................23

2.   Limitation of Tax Attributes. .............................................................24

C.   Certain United States Income Tax Consequences to Holders of Class 3 Claims and Class 4 Claims. ................................................................24

1.   Consequences for U.S. Holders Receiving Senior and Junior TruPS .................24

2.   Accrued but Untaxed Interest ............................................................25

3.   Market Discount ................................................................................26

      4.   Information Reporting and Backup Withholding.................................................26

XII.   CERTAIN SECURITIES LAW MATTERS....................................................................27

    A.   TruPS.........................................................................................................................27

    B.   Issuance and Resale of Senior and Junior TruPS Under the Amended Plan..............27

        1.   Exemption from Registration. ..............................................................27

        2.   Resales Of Senior And Junior TruPS; Definition of Underwriter......................28

    C.   No Listing of Senior or Junior TruPS.......................................................................30

XIII.   CONCLUSION AND RECOMMENDATION...............................................................30

# I.    INTRODUCTION.

Catherine Steege, not individually but solely as Chapter 11 Trustee (the "**Trustee**") of Northwest Bancorporation of Illinois, Inc. (the "**Debtor**"), and AmeriNational Community Services, LLC ("**AmeriNat**", together with the Trustee, the "**Amended Plan Proponents**") respectfully submit this Disclosure Statement (the "**Disclosure Statement**") in support of the Amended *Joint Chapter 11 Plan Of Reorganization Proposed By The Chapter 11 Trustee and AmeriNational Community Services, LLC* dated February 10, 2023 (as it may hereafter be amended or modified, the "**Amended Plan**"), a copy of which is attached to this Disclosure Statement as Exhibit 1.[1]

**The Amended Plan Proponents believe the Amended Plan is in the best interests of, and provides the highest and most expeditious recoveries to, all parties who hold Claims against the Debtor. The Amended Plan Proponents recommend that all Classes of Claims entitled to vote accept the Amended Plan.**

# II.    OVERVIEW OF THE AMENDED PLAN AND SUMMARY OF DISTRIBUTIONS.

On July 2, 2021, Northwest Bancorporation of Illinois, Inc. (the "Debtor") filed a voluntary chapter 11 petition with the United States Bankruptcy Court for the Northern District of Illinois (the "**Bankruptcy Court**"). On August 4, 2021, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "**Committee**"). On March 10, 2022, the Bankruptcy Court entered an Order directing the United States Trustee to appoint a chapter 11 trustee. On March 17, 2022, the Bankruptcy Court approved the appointment of the Trustee.

The Debtor is a bank holding company incorporated under the laws of the state of Delaware. First Bank and Trust Company of Illinois ("**First Bank**") is the Debtor's wholly-owned operating subsidiary, which carries on the business of operating a commercial bank located in Palatine, Illinois.  First Bank is a state charted institution and is regulated by the Federal Deposit Insurance Corporation and the State of Illinois Department of Financial and Professional Regulation, Division of Banking.

Following her appointment, the Trustee engaged in discussions with the members of the Committee. The Committee members were: (i) OSP Value Fund, L.P. ("**OSP**"), (ii) HoldCo Opportunities Fund, L.P. ("**HoldCo**") and (iii) The Bank of New York Mellon Trust Company, N.A., Indenture Trustee for the Junior TruPs. OSP and HoldCo held 100% of the Debtor's Junior TruPs. The TruPs are fixed and floating rate preferred securities issued through three separate trusts. The Debtor restructured its obligations to the Holders of the TruPs in 2015 pursuant to a confirmed chapter 11 plan of reorganization. The Amended Plan classifies the TruPs into two classes: the Senior TruPs and the Junior TruPs. The Junior TruPs right to payment is contractually subordinated to the Senior TruPs.

---

[1] The definitions set forth in Article I of the Amended Plan apply to capitalized terms used, but not defined, in this Disclosure Statement. The rules of construction set forth in Article II of the Amended Plan apply to this Disclosure Statement.

As a result of the discussions between the Trustee and the Committee, AmeriNat, which is affiliated with OSP, acquired all of the Debtor's Junior TruPs from OSP and HoldCo and agreed to sponsor this Amended Plan with the Trustee on the terms set forth herein. AmeriNat's acquisition of all of the Junior TruPs resulted in the U.S. Trustee disbanding the Committee on November 17, 2022.

In summary, the Amended Plan provides for AmeriNat to receive: (a) 100% of the common stock of the Reorganized Debtor; and (b) Junior TruPs in a reduced amount which will be repaid in accordance with the terms of the Junior TruPs Indentures. The Debtor will reinstate the Senior TruPs and recapitalize the interest that has accrued through the Petition Date. Repayment of the Senior TruPs will be made pursuant to the terms of the Senior TruPs Indenture. Administrative Claims, Professional Fee Claims, U.S. Trustee Fees, Priority Tax Claims, Other Priority Claims, and Allowed Unsecured Claims, if any, will be paid in full on the Effective Date from the proceeds of an Exit Facility to be furnished by an affiliate of AmeriNat. The Interests of the Debtor's existing shareholders will be cancelled.

AmeriNat's ability to acquire 100% of the ownership of the Debtor is dependent upon the approval of the Illinois Department of Financial and Professional Regulation, the Federal Reserve Bank of Chicago, and the Board of Governors of the Federal Reserve System (the "**Regulators**"). AmeriNat has begun the process of seeking such approval and the Amended Plan will not become effective until all required approvals are received. The Amended Plan refers to this proposed transaction as the "**Reorganization Transaction**."

In the event that AmeriNat is unable to obtain the necessary approvals, the Trustee will commence an auction to find a buyer for the Debtor's interests in First Bank. Any buyer selected through such an auction would also be required to obtain the approval of the Regulators. The Amended Plan refers to this alternative as the "**Sale Transaction**."

Because of the need for regulatory approval, the Amended Plan Proponents cannot state with certainty when the distributions contemplated under either the Reorganization Transaction or Sale Transaction will occur, but every effort will be made to take whatever actions are required to obtain prompt approval from the Regulators.

This Disclosure Statement describes why Claims are placed into certain Classes, the relative allocations of property to the Holders of such Claims, the manner by which the Debtor's Assets are to be distributed, information about the Debtor's expected future business, and the applicable bankruptcy and tax consequences of the Amended Plan. You are advised and encouraged to read both this Disclosure Statement and the Amended Plan in their entirety before voting to accept or reject the Amended Plan.

The following table summarizes the classification and treatment of Claims under the Amended Plan under both the Reorganization Transaction and Sale Transaction and the amount of Claims in each Class. For a more detailed description of the Amended Plan's classification and treatment of Claims, see Section VI below:

| CLASS | DESCRIPTION | IMPAIRMENT | VOTING | TREATMENT | TOTAL CLAIM AMOUNT |
|---|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept | 100% | The Amended Plan Proponents do not believe that there are any Other Priority Claims. |
| 2 | General Unsecured Claim | Impaired | Yes | 100% Reorganization Amended Plan<br><br>100% Pro Rata Share of Sale Transaction Proceeds est. at $8 Million | Two Claims Filed, but only one Claim asserts a dollar amount that is due in the amount of $26,371.15. This Claim has not been Allowed. |
| 3 | Senior TruPs Claims | Impaired | Yes | 100% Reorganization Amended Plan<br><br>100% Pro Rata Share of Sale Transaction Proceeds est. at $8 Million | One Claim Filed by the Indenture Trustee in the amount of $1,105,841.73 |
| 4 | Junior TruPs Claims | Impaired | Yes | 100% Reorganization Amended Plan<br><br>30% Pro Rata Share of Sale Transaction Proceeds est. at $8 Million | Two amended Claims Filed by the Indenture Trustee in the total amount of $18,035,276.68 |
| 5 | Interests General Unsecured Claims | Impaired | Deemed to Reject | 0% | 100% held by Robert Hershenhorn |

As provided by Section 1126 of the Bankruptcy Code, only Classes of Claims that are both impaired under the Amended Plan and entitled to a recovery under the Amended Plan are permitted to vote to accept or reject the Amended Plan. Here, the Classes of Claims entitled to vote are Class 2 (General Unsecured Claims), Class 3 (Senior TruPs Claims), and Class 4 (Junior TruPs Claims) (collectively, the "**Voting Classes**"). Claims that will be paid in full are deemed to have accepted the Amended Plan and Claims that will receive no distribution under the Amended Plan are deemed to have rejected the Amended Plan.

## III.    VOTING AND CONFIRMATION PROCEDURES AND DEADLINES.

By order dated February [##], 2023 (the "**Disclosure Statement Order**"), the Bankruptcy Court conditionally approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable creditors of the Debtor to make an informed decision on whether to accept the Amended Plan. The Bankruptcy Court's conditional approval of the Disclosure Statement does not constitute a recommendation by the Bankruptcy Court to creditors that they should vote to accept or to reject the Amended Plan.

The Holders of Claims in Class 2 – General Unsecured Claims, Class 3 – Senior TruPS Claims, and Class 4 – Junior TruPS Claims are Impaired under the Amended Plan have the right to vote to accept or reject the Amended Plan. The Amended Plan Proponents are **_not_** soliciting votes from Holders of Claims and Interests in Classes 1 or 5.

Detailed instructions regarding how to vote on the Amended Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Amended Plan. All Ballots must be completed and signed and filed with the Clerk of the Court so that they are *actually received* by the Clerk by [##], 2023 at 4:30 p.m. (prevailing Central Time) (the "**Voting Deadline**"). Ballots can be filed with the Clerk electronically using the Bankruptcy Court's ECF electornic filing system or by mail. If by mail to: The Office of the Clerk, United Stated Bankruptcy Court for the Northern District of Illinois, Eastern Division, 219 S Dearborn St. Chicago, IL 60604. If by ECF, see information at www.ilnb.uscourts.gov.

If your vote was solicited by your broker, dealer, commercial bank, trust company, a trustee, or other nominee ("**Record Holder**"), you must complete a ballot (the "**Beneficial Owner Ballot**") and transmit your vote to the Record Holder in accordance with the instructions contained in the Solicitation Package sent to you — including by the deadline set forth therein. The Record Holder will complete a Ballot summarizing votes cast by beneficial owners (the "**Master Ballot**") and submit such Master Ballot by the Voting Deadline.

**The Amended Plan Proponents believe that each and every Holder of a Claim in Class 3 – Senior TruPS Claims and Class 4 – Junior TruPS Claims is an "accredited investor,"** as that term is defined by the Securities and Exchange Commission ("**SEC**") for the purposes of rule 506 of Regulation D promulgated under the Securities Act ("**Accredited Investor**"). As such, the Amended Plan Proponents believe they are only soliciting Accredited Investors. However, in any event, only Accredited Investors are eligible to vote on the Amended Plan.

Objections to Confirmation of the Amended Plan must be filed and served on the Amended Plan Proponents and the U.S. Trustee no later than [##], 2023 in accordance with the Notice of the Confirmation Hearing that accompanies this Disclosure Statement. Unless objections to the confirmation of the Amended Plan are timely filed and served, those objections might not be considered by the Bankruptcy Court.

The Bankruptcy Court has scheduled a hearing to consider confirmation of the Amended Plan on [##], 2023 at [##] a.m. (prevailing Central time) (the "**Confirmation Hearing**"), in person or by Zoom in Courtroom 742, Dirksen Federal Building, 219 S. Dearborn Street, Chicago, Illinois, 60604. Zoom information may be found on the Bankruptcy Court's website at www.ilnb.uscourts.gov. The Confirmation hearing may be adjourned from time to time, including without further notice other than by announcement in the Bankruptcy Court on the scheduled date of the Confirmation Hearing. At the Confirmation Hearing, the Bankruptcy Court will consider whether the Amended Plan satisfies the various requirements of the Bankruptcy Code for confirmation. The Bankruptcy Court will also receive and consider a ballot report prepared by Amended Plan Proponents tabulating the votes accepting and rejecting the Amended Plan.

**IV.    QUESTIONS AND ANSWERS REGARDING THE CHAPTER 11 AND CONFIRMATION PROCESS.**

   **A.   What is chapter 11?**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the date the chapter 11 case is filed. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

   **B.   Why are the Amended Plan Proponents sending me this Disclosure Statement?**

You are receiving this Disclosure Statement because you are a Holder of a Claim entitled to vote to accept or reject the Amended Plan. Prior to voting on the Amended Plan, you are encouraged to read this Disclosure Statement and all documents attached to this Disclosure Statement in their entirety. As reflected in this Disclosure Statement, there are risks, uncertainties, and other important factors that could cause the Amended Plan Proponents' actual performance or achievements to be materially different from those it may project, and the Amended Plan Proponents undertake no obligation to update any such statement. Certain of these risks, uncertainties, and factors are described in Section IX of this Disclosure Statement, entitled "Risk Factors."

   **C.   What is the Confirmation Hearing and what is its purpose?**

Section 1128 of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Amended Plan and recognizes that any party in interest may object to confirmation of the Amended Plan. At the Confirmation Hearing, the Bankruptcy Court will determine whether to approve the Disclosure Statement and whether the Amended Plan should be Confirmed in light of both the requirements of the Bankruptcy Code and objections, if any, that are timely filed.

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under the plan of reorganization, any person acquiring property under the plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court

confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of the plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

### D. What do you mean when you refer to "Confirmation" and "Effective Date"?

"Confirmation" of the Amended Plan refers to the approval of the Amended Plan by the Bankruptcy Court. Confirmation of the Amended Plan does not guarantee that you will receive the distribution contemplated under the Amended Plan. After confirmation of the Amended Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Amended Plan can be consummated and become effective on the "Effective Date."

The "Effective Date" will occur when the Bankruptcy Court enters an order confirming the Amended Plan and the conditions of Article IX of the Amended Plan have been satisfied or waived. The primary condition to the Amended Plan going effective under both the Sale and Reorganization Transaction is approval by the Regulators of a new shareholder for the Debtor.

### E. Will the Debtor receive a discharge and will there be any other be any releases granted to parties other than the Debtor as part of the Amended Plan?

The Debtor will receive a discharge. The Trustee, the members of the Committee, AmeriNat, the Exit Lender, the Debtor, and the Reorganized Debtor will be protected from claims arising from or relating to any act or omission in connection with this Chapter 11 Case, the pursuit of confirmation of the Amended Plan, or the administration of the Amended Plan, including the exercise of their business judgment and the performance of their fiduciary obligations.

## V. THE CHAPTER 11 CASE.

### A. The Debtor's Business And Ownership.

The Debtor is a one-bank holding company incorporated under the laws of Delaware and headquartered in Palatine, Illinois. Through its wholly-owned subsidiary, First Bank, the Debtor operates one full service banking branch. First Bank is a state charted institution and is regulated by the Federal Deposit Insurance Corporation (the "**FDIC**") and the State of Illinois Department of Financial and Professional Regulation, Division of Banking (the "**Division**"). Robert Hershenhorn owns 100% of the Debtor's stock. The most recent available financial statements for FirstBank are attached hereto as <u>Exhibit 2</u>.

### B. The Debtor's Scheduled Assets And Liabilities And Operating Reports.

The Debtor's only scheduled assets are: (i) its stock in First Bank, which the Debtor listed on its Schedules as having a book value of $17,304,816; (ii) its ownership of the trusts which issued the TruPs, which the Debtor listed on its Schedules as having a book value of $568,406; and (iii) $73.70 in cash.

The Debtor scheduled unsecured claims in the total amount of $18,407,554.20, primarily on account of the amounts due to the Holders of Senior TruPs and the Junior TruPs. The TruPS are a hybrid form of security that has characteristics of both debt and equity. Regulatory changes

in the late 1990s allowed for banks to include 25 percent of their outstanding TruPS in their calculation of Tier 1 capital. To qualify as Tier 1 capital, a TruPS had to provide for a five-year deferral of interest period which, once triggered, would temporarily suspend the obligation of the TruPS issuer to make interest payments due on the TruPS. During the deferral period, interest on the TruPS accrues and becomes due once the deferral period ends.

Because the Debtor has no operations, employees, or any significant cash assets and no disbursements have been made during the Chapter 11 case, the monthly operating reports that the Debtor has filed with the Court report the book value of the Debtor's assets at the amounts contained on the Debtor's Schedules. [Dkt. 51, 54, 55, 58, 79, 81, 82, 83, 84, 108, 109, 157, 168, 172, 189-191, 193, 194, 196, 200-202.] The most recent Monthly Operating Report is attached hereto as <u>Exhibit 3</u>.

### C.   Events Leading Up To The Chapter 11 Filing.

This is the Debtor's second chapter 11 case. In 2015, the Debtor restructured its obligations due to the Holders of the TruPs. Interest was deferred following the confirmation of the 2015 Plan.

In March 2020, the Debtor hired investment banker Janney Montgomery Scott LLC ("**Janney**") to market the stock of First Bank for sale. Janney ran a sale process, which produced certain interested parties. One prospective purchaser engaged in lengthy conversations with the Debtor, First Bank, and the two largest holders of the Junior TruPS about purchasing the stock of First Bank or, alternatively, purchasing all of the TruPS securities themselves and effecting a change of control at a later date. That transaction failed to close.

In late June 2021, one of the holders of the Junior TruPS issued a notice of default and acceleration to the Debtor. On July 2, 2021, the Debtor filed its chapter 11 petition.

### D.   Administration Of The Chapter 11 Case.

#### 1.   First Day Motions And Formation Of The Committee.

The Debtor has no employees, business operations, or any secured debt. As a result, the Debtor did not file the typical first day motions.

On August 6, 2021, the United States Trustee appointed the Committee. Its members were: (i) OSP; (ii) HoldCo; and (iii) The Bank of New York Mellon Trust Company, N.A., Indenture Trustee for the Junior TruPs. [Dkt. 28.]

#### 2.   The Sale Motion.

On September 30, 2021, the Court authorized the Debtor to retain Janey as its investment banker to market the Debtor's stock in First Bank. [Dkt. 70.] Also on September 30, 2021, the Court granted the Debtor's *Motion to Establish Bidding Procedures for the Sale of Debtor's Only Material Asset* [Dkt. 52] and approved the bidding procedures, as amended. [Dkt. 74].

Originally, the deadline for submitting bids to purchase the stock in FirstBank was set as December 31, 2021. In the event multiple bids were received, an auction was scheduled for January

7, 2022. As a result of concerns with the sale process, the Committee filed its *Emergency Motion to Reschedule Auction* [Dkt. 120]. The extended bid deadline was February 18, 2022.

According to the Debtor's Status Report, Janey contacted over 70 potential bidders. Twenty-one prospective bidders signed Non-Disclosure Agreements to gain access to the data room. Janey received four bids by the February 18, 2022, bid deadline. [Dkt. 134.]

On March 2, 2022, the Committee filed its own status report, raising its continued concerns about the fairness of the auction process. The Committee also stated that the Debtor had failed to respond to the Committee's concerns or to meaningfully consult with the Committee as required by the Bidding Procedures Order. [Dkt. 135.] The auction never took place. Janey terminated its engagement on May 3, 2022. [Dkt. 175.]

### 3. The Chapter 11 Trustee's Administration.

On March 7, 2022, the Committee filed an *Emergency Motion For The Appointment Of Chapter 11 Trustee*. [Dkt. 140]. On March 10, 2022, the Court granted the Committee's Emergency Motion. [Dkt. 148]. On March 17, 2022, the Court approved the appointment of Catherine Steege as Chapter 11 Trustee. [Dkt. 155].

Following her appointment, the Trustee met with the Committee and the Regulators to discuss whether to continue the sale process and other alternatives to the sale process. Pursuant to an Order entered on April 21, 2022, the Court authorized the Trustee to direct the hiring of the Bovenzi Group by FirstBank to consult on viable alternative paths to maximize value the value of FirstBank. [Dkt. 174.]

After several months of negotiations, AmeriNat purchased the Junior TruPs held by OSP and Holdco, for purposes of restructuring the Debtor's balance sheet and acquiring ownership of the Debtor. As a result of AmeriNat's purchase of the Junior TruPs, on November 17, 2022, the United States Trustee disbanded the Committee. [Dkt. 197.]

AmeriNat is affiliated with OSP. AmeriNat provides loan servicing, asset management, underwriting, and other services to government agencies, nonprofits, financial institutions, and private investors across the continental United States and Puerto Rico. It manages over $11 billion in loans.

## VI. SUMMARY OF THE AMENDED PLAN.

The Amended Plan Proponents propose the Amended Plan in good faith and believe the Amended Plan is feasible and in the best interest of the creditors of the Debtor. The Amended Plan Proponents therefore recommend acceptance of the Amended Plan by holders of Claims in the Voting Classes. This Section VI summarizes key components of the Amended Plan. To the extent of any inconsistencies between these summaries and the terms of the Amended Plan, the Amended Plan controls. To the extent the summaries omit any provisions of the Amended Plan, such omission has no effect on the enforceability of those provisions in the Amended Plan. All Claimants are encouraged to carefully read the Amended Plan before voting.

### A. Treatment of Unclassified Claims.

#### 1. Administrative Claims.

An Administrative Claim is a claim for payment of an administrative expense of a kind specified in Bankruptcy Code Section 503(b) and referred to in Bankruptcy Code Section 507(a)(2), including the actual and necessary costs and expenses of preserving the estate or operating the Debtor's businesses after the commencement of a chapter 11 case, and compensation for legal and other services and reimbursement of expenses awarded or allowed under Bankruptcy Code Sections 330(a), 331, or 503.

The Amended Plan provides that Holders of Administrative Claims must file any requests for allowance and payment within thirty days after a notice of the Effective Date is filed with the Bankruptcy Court. Each Allowed Administrative Claim shall be paid in full in Cash under the Amended Plan unless otherwise agreed between the Reorganized Debtor and the Holder of the Allowed Administrative Claim. Such payment shall be made either (a) on or as soon as practicable following the Effective Date, or, if later, the Date on which the Administrative Claim is Allowed; or (b) upon such terms as may be agreed to in writing by the Administrative Claimant. However, any Administrative Claim incurred postpetition by the Debtor in the ordinary course of its operations, will be paid or performed in accordance with the terms and conditions of the particular agreements or transactions giving rise to the claim by the Debtor before the Effective Date or by the Reorganized Debtor after the Effective Date, or as otherwise agreed by the Amended Plan ProponentsAmended Plan Proponents (if before the Effective Date) or the Reorganized Debtor (on and after the Effective Date), on the one hand, and the Holder of such Administrative Claim, on the other.

The Amended Plan Proponents do not believe that there will be any Administrative Claims other than U.S. Trustee fees and Professional Claims.

#### 2. Professional Claims.

The Amended Plan sets forth the manner and timing in which Professionals must submit Professional Claims to be considered for payment. All Professionals or other Persons requesting compensation or reimbursement of expenses pursuant to any of Sections 327, 328, 330, 331, 503(b), and 1103 of the Bankruptcy Code for services rendered on or before the Effective Date (including, among other things, any compensation requested by any Professional or any other Person for making a substantial contribution in the Chapter 11 Case) shall file and serve an application for final allowance of compensation and reimbursement of expenses accruing from the Petition Date to the Effective Date, no later than 30 days after the Effective Date, or such later date as ordered by the Bankruptcy Court. In the event there is a dispute over what amount of a Professional Fee Claim shall be Allowed, if any, the dispute shall be resolved by the Bankruptcy Court.

#### 3. Priority Tax Claims.

A Priority Tax Claim is an unsecured Claim of a governmental unit entitled to priority in payment pursuant to any provision of Section 507(a)(8) of the Bankruptcy Code. The Trustee does not believe that there are any Priority Tax Claims. To the extent that there are any Allowed Priority

Tax Claims not paid prior to the Effective Date, the Reorganized Debtor shall (a) pay such Claim in Cash as soon as practicable after the Effective Date; or (b) provide such other treatment agreed to by the Holder of such Allowed Priority Tax Claim and the Amended Plan Proponents (if before the Effective Date) or the Reorganized Debtor (on and after the Effective Date).

### 4. U.S. Trustee Fees.

All fees due and payable pursuant to 28 U.S.C. § 1930 (the "**U.S. Trustee Fees**") and not paid prior to the Effective Date shall be paid in Cash as soon as practicable after the Effective Date. The Trustee does not believe that it will owe any U.S. Trustee Fees as of the Effective Date. After the Effective Date, the Reorganized Debtor shall pay quarterly fees to the U.S. Trustee, in Cash, until the Chapter 11 Case is closed and a Final Decree is entered.

### B. Treatment of Classified Claims.

The categories of Claims set forth in the Amended Plan and summarized below classify Claims for all purposes, including voting, confirmation, and distribution under the Amended Plan and Sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim is classified within a particular Class for the purpose of receiving distributions only to the extent that such Claim is Allowed and has not already been satisfied before the Effective Date.

The treatment in the Amended Plan is in full and complete satisfaction of all of the legal, contractual, and equitable rights that each Holder of a Claim may have against the Debtor. This treatment supersedes and replaces any agreements or rights those Holders have in or against the Debtor. All distributions under the Amended Plan will be tendered to the Person holding the Claim.

### 1. Class 1 – Other Priority Claims.

a. **Classification:** Class 1 consists of all Other Priority Claims, if any. The Amended Plan Proponents do not believe that there are any Other Priority Claims.

b. *Allowance*: Notwithstanding anything in the Amended Plan to the contrary, a Class 1 Claim, if existing, may only become Allowed by Final Order of the Bankruptcy Court. The Trustee is not aware of any asserted Class 1 Claims and believes that no Class 1 Claims exist.

c. *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class 1 agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class 1, each such Holder shall be paid in full in Cash by the Reorganized Debtor on the later of the Effective Date or the date such Class 1 Claim becomes an Allowed Class 1 Claim pursuant to a Final Order or as soon as reasonably practicable thereafter.

d. *Voting*: Class 1 is Unimpaired under the Amended Plan. Holders of Claims in Class 1 are conclusively presumed to have accepted the Amended Plan

pursuant to Section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Amended Plan.

2. **Class 2 – General Unsecured Claims.**

    a.   *Classification:* Class 2 consists of all General Unsecured Claims. One Unsecured Claim was filed in a liquidated amount of $26,371.15. This Claim has not been Allowed.

    b.   *Treatment:* Except to the extent that a Holder of a Class 2 Claim agrees to less favorable treatment, each Holder of a Class 2 Claim shall receive, in full and final satisfaction, settlement, release, and discharge of and in exchange for, such Holder's Allowed Claim in Class 2:

        Reorganization Transaction: If a Reorganization Transaction is consummated, on the Effective Date, each Holder of an Allowed Class 2 Claim shall receive payment in full in Cash from the Reorganized Debtor as soon as reasonably practicable after the latest of: (a) the Effective Date, or (b) if a Disputed Claim, the date the Class 2 Claim becomes an Allowed Class 2 Claim.

        Sale Transaction: If a Sale Transaction is consummated on the Effective Date, each Holder of an Allowed Class 2 Claim shall receive its Pro Rata share of the Net Sales Proceeds. For purposes of calculating the Pro Rata share of each Class 2 Claim, if the available Net Sales Proceeds are not sufficient to pay the Allowed amount of all Class 2, Class 3, and Class 4 Claims in full, the Pro Rata share will be determined by including the Allowed amount of all Class 2, Class 3, and Class 4 Claims in the denominator.

    c.   *Voting:* Holders of Class 2 Claims are impaired under the Amended Plan and entitled to vote to accept or reject the Amended Plan.

3. **Class 3 – Senior TruPS Claims.**

    a.   *Classification*: Class 3 consists of all Senior TruPS Claims.

    b.   *Allowance*: The Senior TruPS Claims shall be Allowed in an amount of $1,105,841.73.

    c.   *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class 3 agrees to a less favorable treatment, each Holder of a Class 3 Claim shall receive, in full and final satisfaction, settlement, release, and discharge of and in exchange for, such Holder's Allowed Claim in Class 3:

        Reorganization Transaction: If a Reorganization Transaction is consummated, on the Effective Date, all of the Debtor's outstanding obligations on account of Allowed Senior TruPS Claims under the applicable TruPS Documents shall be reinstated, with all accrued and unpaid interest

owed on account of the Allowed Senior TruPS Claims through the Petition Date recapitalized as principal which, if all outstanding fees and expenses of the Senior TruPS Indenture have been paid, will be deemed to constitute a waiver or cure of any and all preexisting defaults. The Reorganized Debtor will repay each Class 3 Claim as recapitalized in accordance with and pursuant to the terms of the applicable TruPS Documents. All rights and obligations under the TruPS Documents shall remain in full force and effect, including all rights of the Senior TruPS Indenture Trustee. The Senior TruPS Common Securities Claim will pass through unimpaired, and be held by the Reorganized Debtor with its ultimate disposition consistent with the terms of the applicable TruPS Documents. The payment of all amounts due on account of the Reinstated Junior TruPS shall be subordinated and junior in right of payment to the prior payment in full amounts due on account of the reinstated Senior TruPS subject to the terms and provisions of the TruPS Documents.

Sale Transaction: If a Sale Transaction is consummated, on the Effective Date, each Holder of an Allowed Class 3 Claim shall receive its Pro Rata share of Net Sales Proceeds. For purposes of calculating the Pro Rata share of each Class 3 Claim, if the available Net Sales Proceeds are not sufficient to pay the Allowed amount of all Class 2, Class 3, and Class 4 Claims in full, the Pro Rata share will be determined by including the Allowed amount of all Class 2, Class 3, and Class 4 Claims in the denominator. All distributions to which an Allowed Class 4 Claim Holder is entitled shall be received by the Class 3 Claim Holder until the Class 3 Claims are satisfied in full.

d. **Voting:** Holders of Class 3 Claims are impaired under the Amended Plan and entitled to vote to accept or reject the Amended Plan.

## 4. Class 4 – Junior TruPS Claims.

a. **Classification:** Class 4 consists of all Junior TruPS Claims against the Debtor.

b. **Allowance:** The Junior TruPS Claims shall be Allowed in an amount of $18,034,909.02 consisting of an Allowed Capital Securities Claims of $17,493,462.14 and an Allowed Common Securities Claims of $541,446.88.

c. **Treatment:** The Holder of the Junior TruPS Capital Securities Claims shall receive, in full and final satisfaction, settlement, release, and discharge of and in exchange for, such Holder's Allowed Claim in Class 4:

1) Reorganization Transaction: If a Reorganization Transaction is consummated, on the Effective Date, the Holder of the Allowed Junior TruPs Capital Securities Claims will receive on account of such Allowed Junior TruPs Capital Securities Claims: (a) 100% of the Reorganized Common Stock in the Reorganized Debtor; and (b) reinstatement of the Allowed Junior TruPs Capital Securities Claims in the amount of

$9,660,000.00 under the applicable TruPs Documents (the Restated Class 4 Capital Securities Claim), which will be deemed to constitute a waiver or cure of any and all preexisting defaults. The Reorganized Debtor will repay each Allowed Restated Class 4 Capital Securities Claim in accordance with and pursuant to the terms of the applicable TruPS Documents. For the avoidance of doubt, the Restated Class 4 Capital Securities Claims remain subordinate to the Class 3 Claims. The Reorganized Debtor and AmeriNat retain the right to adjust the amount of the Allowed Junior TruPS Capital Securities Claims allocated to the Restated Class 4 Capital Securities Claim as needed to receive approval from the Regulators for AmeriNat and the Exit Lender to be the owner of the Reorganized Common Stock. The Junior TruPS Common Securities Claim will pass through unimpaired and be held by the Reorganized Debtor with its ultimate disposition consistent with the terms of the applicable TruPS Documents.

2) <u>Sale Transaction</u>: If a Sale Transaction is consummated, on the Effective Date, each Holder of an Allowed Class 4 Claim shall receive its Pro Rata share of Net Sales Proceeds. For purposes of calculating the pro rata share of each Class 4 Claim, if the available Net Sales Proceeds are not sufficient to pay the Allowed amount of all Class 2, Class 3, and Class 4 Claims in full, the Pro Rata share will be determined by including the Allowed amount of all Class 2, Class 3, and Class 4 Claims in the denominator. All distributions to which Class 4 Claim Holder is entitled shall be received by the Class 3 Claim Holder until the Class 3 Claims are satisfied in full. After the Class 3 Claims are satisfied in full, remaining pro rata distributions will be received by the Holder of the Junior TruPS Capital Securities Claim until the Junior TruPS Capital Securities Claims are satisfied in full, then all remaining pro rata distributions shall be received by the Holder of the Junior TruPS Common Securities Claim.

**d.** *Voting*: Class 4 is Impaired under the Amended Plan. Holders of Claims in Class 4 are entitled to vote to accept or reject the Amended Plan.

**5. Class 5 – Interests.**

**a.** *Classification:* Class 5 consists of all Interests in the Debtor.

**b.** *Treatment*:

1) <u>Reorganization Transaction</u>: If a Reorganization Transaction is consummated, on the Effective Date, all Interests in the Debtor shall be deemed cancelled as of the Effective Date. There shall be no Distribution to any Holders of Interests on account of such Interests.

2) <u>Sale Transaction:</u> If a Sale Transaction is consummated, on the Effective Date, each Holder of an Allowed Class 5 Interest shall receive its Pro Rata share of Net Sales Proceeds remaining after payment in full of the Allowed amount of all Unclassified Claims, and Class 1, 2, 3, and 4 Claims.

c. ***Voting:*** Class 5 is Impaired under the Amended Plan and the Amended Plan ProponentsAmended Plan Proponents do not believe that any funds will be available to satisfy the Holders of Class 5 Interests. Accordingly, Holders of Interests in Class 5 are conclusively presumed to have rejected the Amended Plan pursuant to Section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Amended Plan.

### C.   Conditions To The Effectiveness Of The Amended Plan.

Article IX of the Amended Plan sets forth the conditions precedent to the effectiveness of the Amended Plan. The Amended Plan's Effective Date will occur when each of those conditions have been satisfied or waived. The primary condition to effectiveness of the Amended Plan is approval of the Regulators of AmeriNat as a bank holding company. AmeriNat has begun the process of obtaining that approval but there is no assurance that the Regulators will approve AmeriNat. If AmeriNat is not approved to be a bank holding company, the Trustee will conduct a sale process and auction to sell the Debtor's FirstBank stock in FirstBank. Any Sale Transaction will also require the approval of the Regulators.

### D.   Provisions Governing Distribution To Holders of Allowed Claims.

#### 1.   Distribution Only to Holders of Allowed Claims.

Unless otherwise provided in the Amended Plan, on the Effective Date or as soon as practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim or as soon as practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of the Distribution that the Amended Plan provides for Allowed Claims in the applicable Class. In the event that any payment or act under the Amended Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. Except as otherwise provided in the Amended Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the Distributions provided for in the Amended Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date. No partial Distributions shall be made with respect to any Disputed Claim until the Disputed Claim has become an Allowed Claim in its entirety or has otherwise been resolved by settlement or Final Order.

#### 2.   Indenture Trustee Fees.

Outstanding fees and documented expenses, including legal fees and expenses of counsel, will be paid by the Reorganized Debtor to the TruPS Indenture Trustees in cash on the Effective Date in the event of a Reorganization Transaction, without the need for any of the Indenture

Trustees to file an application with the Court for the payment of such fees and expenses. In the event of a Sale Transaction, the net proceeds of the sale shall be distributed to holders of Allowed Claims consistent with the priorities established by the Bankruptcy Code, and the TruPS Indenture Documents as soon as practical following the closing of the sale.

### 3. Delivery of Distributions in General.

Except as otherwise provided herein, the Trustee or Reorganized Debtor shall make Distributions to Holders of Allowed Claims on the Effective Date at the address for each such Holder as indicated on the Proof of Claim as of the date of any such Distribution.

Cash distributions on account of Senior TruPS Claims and Junior TruPS Claims will be made to the respective Indenture Trustees for further distribution in accordance with the terms of the TruPS Indentures.

### 4. Minimum Distributions.

Notwithstanding any other provision of the Amended Plan, the Trustee or Reorganized Debtor will not be required to make Distributions of Cash less than $100 in value, and each such Claim to which this limitation applies shall be discharged and its Holder is forever barred pursuant from asserting that Claims against the Reorganized Debtor or its property.

### 5. Undeliverable Distributions and Unclaimed Property.

In the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Holder provides the Trustee or Reorganized Debtor with such Holder's then-current address, at which time such Distribution shall be made to such Holder without interest; provided that such Distributions shall be deemed unclaimed property under Section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtor automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be discharged and forever barred.

### 6. Manner of Payment.

All Distributions under the Amended Plan shall be made by the Trustee or Reorganized Debtor. At the option of the Trustee or Reorganized Debtor, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

### 7. Compliance with Tax Requirements.

In connection with the Amended Plan, to the extent applicable, the Reorganized Debtor shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all Distributions pursuant to the Amended Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Amended Plan to

the contrary, the Reorganized Debtor shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Distribution to be made under the Amended Plan to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

### 8. Allocations.

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

### 9. No Post-Petition Interest On Claims.

Unless otherwise specifically provided for in the Amended Plan, the Confirmation Order, or required by applicable bankruptcy law, post-petition interest shall not accrue or be paid on any Claims against the Debtor, and no Holder of a Claim against the Debtor shall be entitled to interest accruing on or after the Petition Date on any such Claim.

### 10. Setoffs and Recoupment by Trustee or Reorganized Debtor.

The Trustee or Reorganized Debtor may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtor may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor or the Reorganized Debtor of any such Claim it may have against the Holder of such Claim.

## VII. MEANS FOR IMPLEMENTATION OF THE AMENDED PLAN AND FINANCIAL INFORMATION.

### A. Reorganization Transaction.

AmeriNat, which is the Holder of all Class 4 Claims, proposes to acquire 100% of the equity of the Reorganized Debtor by converting a portion of its Class 4 Claims into new common stock of the Reorganized Debtor. The Exit Lender will also provide an Exit Facility to the Reorganized Debtor, which in turn will be distributed to the Trustee, in an amount sufficient to allow the Trustee to pay all Effective Date Distributions in full. The Effective Date of the Amended Plan is conditioned, upon other things, AmeriNat and the Exit Lender receiving approval from the Regulators to be the owner of the Reorganized Common Stock and lender to the Reorganized Debtor. In the event that AmeriNat or the Exit Lender is unable to obtain the necessary approvals from the Regulators, then the Trustee will implement the Sale Transaction. The Effective Date of the Amended Plan will occur on the first Business Day following receipt of necessary approvals from the Regulators.

Attached hereto as <u>Exhibit 4</u> is a term sheet for the Exit Facility and as <u>Exhibit 5</u> are pro forma income statements and balance sheets as of the Effective Date of the Amended Plan and for the four-year period following the Effective Date.

### B. Sale Transaction.

In the event that the applicable Regulators do not approve AmeriNat as the holder of the Reorganized Common Stock or the Exit Lender as the lender to the Reorganized Debtor, the Trustee shall, subject to Bankruptcy Court approval, retain an investment banker to market the Reorganized Debtor's assets and shall petition the Court to conduct a sale of such assets free and clear of any liens, claims, encumbrances, and interests to the highest and best bidder pursuant to Section 363 of the Bankruptcy Code. The Effective Date of the Amended Plan shall occur on the date that such Sale Transaction is closed, and the Trustee completes the Distribution of the Net Sales Proceeds.

## VIII. EFFECTS OF AMENDED PLAN CONFIRMATION AND DISCHARGE

### A. Discharge.

Assuming the Reorganization Transaction is consummated, on the Effective Date, pursuant to Section 1141(d) of the Bankruptcy Code, the Debtor, the Estate, and the Reorganized Debtor will be discharged from all liability for any and all Claims and Debts, known or unknown, whether or not giving rise to a right to payment or an equitable remedy, that arose, directly or indirectly, from any action, inaction, event, conduct, circumstance, happening, occurrence, agreement, or obligation of the Debtor before the Confirmation Date, or that otherwise arose before the Confirmation Date, including all interest, if any, on any such Claims and Debts, whether such interest accrued before or after the date of commencement of the Chapter 11 Case, and including all Claims and Debts based upon or arising out of any liability of the kind specified in Sections 502(g), 502(h), and 502(i) of the Bankruptcy Code, whether or not (a) a proof of claim is filed or is deemed filed under Section 501 of the Bankruptcy Code; (b) such Claim is Allowed under the Amended Plan; or (c) the Holder of such Claim has accepted the Amended Plan.

### B. Vesting of Assets.

In accordance with Sections 1141 and 1123(a)(5) of the Bankruptcy Code, the Revested Assets shall vest in the Reorganized Debtor on the Effective Date free and clear of all liens, Claims, and interests of Creditors, including successor liability Claims. On and after the Effective Date, the Reorganized Debtor may operate and manage its affairs and may use, acquire, and dispose of property without notice to any Person, and without supervision or approval by the Bankruptcy Court, and free of any restrictions imposed by the Bankruptcy Code, Bankruptcy Rules, or the Bankruptcy Court, other than those restrictions expressly imposed by the Amended Plan or the Confirmation Order.

### C. Exculpation and Limitation of Liability.

**Notwithstanding anything contained herein to the contrary, on the Confirmation Date and effective as of the Effective Date and to the fullest extent authorized by applicable law, none of the Exculpated Parties shall have or incur any liability for any Exculpated**

Claim, or other assertion of liability for any act taken or omitted to be taken in connection with, or arising out of, the Chapter 11 Case, including (1) the negotiation, formulation, or preparation of the Amended Plan or any contract, instrument, document, or other agreement entered into pursuant thereto, (2) any Distributions made pursuant to or in accordance with the Amended Plan, (3) the exercise of their respective business judgment and the performance of their respective fiduciary obligations; (4) the administration of the Estate; and (5) the pursuit of confirmation of the Amended Plan; provided that the foregoing shall not affect the liability of any Person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted actual fraud or willful misconduct.**

The Exculpated Parties are (a) the Trustee; (b) the Reorganized Debtor; (c) the Committee and each member thereof; (d) the Amended Plan Proponents; (e) the Exit Lender; (f) the Debtor; and (g) with respect to the foregoing entities in clauses (a) through (e), each entities' Related Persons. Related Persons are with respect to any Person other than the Debtor, such Person's successors, assigns, and present shareholders, affiliates, parents, subsidiaries, employees, agents, managing agents, administrators, officers, directors, trustees, partners, attorneys, financial advisors, accountants, and consultants, each in their capacity solely as such.

## IX. RISK FACTORS.

In evaluating whether to vote to accept or to reject the Amended Plan, all Claimants holding Allowed Claims and all Claimants in the Voting Classes should carefully read and consider the risk factors set forth below, which describe how the anticipated distributions and treatments under the Amended Plan rely on uncertain assumptions and are not guaranteed. The following disclosures are not intended to be inclusive and should be read in connection with the other disclosures contained in this Disclosure Statement and the exhibits attached hereto. You should consult with your legal, financial, and tax advisors regarding the risks associated with the Amended Plan and distributions you may receive.

### A. Certain Bankruptcy Law Considerations.

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Amended Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Amended Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

#### 1. Parties in Interest May Object to the Amended Plan's Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Amended Plan Proponents believe that the classification of the Claims under the Amended Plan complies with the requirements set forth in the Bankruptcy Code because the Amended Plan Proponents created Classes of Claims, each

encompassing Claims that are substantially similar to the other Claims in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

**2.  Failure to Satisfy Vote Requirements.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Amended Plan, the Amended Plan Proponents intend to seek, as promptly as practicable thereafter, Confirmation of the Amended Plan. In the event that sufficient votes are not received, the Amended Plan Proponents may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Amended Plan.

**3.  The Amended Plan Proponents May Not Be Able to Secure Confirmation of the Amended Plan.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Amended Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Amended Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Amended Plan if it found that any of the statutory requirements for Confirmation had not been met.

Confirmation of the Amended Plan is also subject to certain conditions as described in Article IX of the Amended Plan. If the Amended Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims would receive with respect to their Allowed Claims.

The Amended Plan ProponentsAmended Plan Proponents, subject to the terms and conditions of the Amended Plan, reserve the right to modify the terms and conditions of the Amended Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as of any Classes junior to such non-accepting Class, than the treatment currently provided in the Amended Plan. Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Amended Plan or no distribution of property whatsoever under the Amended Plan.

### 4. Nonconsensual Confirmation.

In the event that any Impaired Class of Claims or Interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one Impaired Class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Amended Plan Proponents believe that the Amended Plan satisfies these requirements, and the Amended Plan Proponents may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Amended Plan may result in, among other things, increased expenses relating to Professional Claims.

### 5. The Trustee May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Amended Plan, the Trustee reserves the right to object to the amount or classification of any Claim under the Amended Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection may not receive its expected share of the estimated distributions described in this Disclosure Statement if the objection is granted.

### 6. Risk of Non-Occurrence of the Effective Date

Although the Amended Plan Proponents believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### B. Necessary Governmental Approvals May Not Be Granted.

Consummation of the Reorganization or Sale Transaction depends upon approval of the Regulators, and all other approvals required by governmental authorities. Failure by any governmental authority to grant a necessary approval could prevent consummation of the Reorganization or Sale Transaction.

### C. Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation Claims or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Amended Plan Proponents or the Reorganized Debtor, as the case may be, may seek to investigate, file, and prosecute Claims and may object to Claims after the Confirmation or Effective Date of the Amended Plan irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

### D. No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a Holder of an Allowed Claim or Interest for or against the Amended Plan does not constitute a waiver or release of any Claims, Causes of Action, including Causes of Action against any "insider" as that term is defined in Section 101(31) of the Bankruptcy Code, or rights of the Amended Plan Proponents or Reorganized Debtor (or any party in interest, as the case may be) to object to that Holder's Allowed Claim, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any Claims or Causes of Action, including Causes of Action against any "insider" as that term is defined in Section 101(31) of the Bankruptcy Code, of the Debtor or its respective Estates are specifically or generally identified herein.

## X.  BEST INTERESTS TEST

Pursuant to Section 1129(a)(7) of the Bankruptcy Code, often called the "best interests test," holders of impaired allowed claims must either (i) accept the plan of reorganization, or (ii) receive or retain under the plan property of a value, as of the plan's assumed effective date, that is not less than the value such rejecting claimants would receive or retain if the Debtor was liquidated under chapter 7 of the Bankruptcy Code on such date.

The Amended Plan Proponents believe that the Amended Plan provides the same or a greater recovery for claimants holding Allowed Claims as would be achieved in a liquidation under chapter 7 of the Bankruptcy Code. This belief is based on a number of considerations, including: (i) the additional administrative claims generated by conversion to a chapter 7 case; (ii) the administrative costs of liquidation and associated delays in connection with a chapter 7 liquidation; (iii) the loss of an agreement by AmeriNat to provide an Exit Facility, each of which likely would diminish the value of the Debtor's assets available for distribution; and (iv) the inability to liquidate the Debtor's interests in FirstBank other than through a regulatory process.

The Amended Plan Proponents have prepared an unaudited Liquidation Analysis, attached hereto as Exhibit 6, to assist claimants holding Allowed Claims in evaluating the Amended Plan. The Liquidation Analysis compares the projected creditor recoveries that would result from the liquidation of the Debtor in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to claimants holding Allowed Claims under the Amended Plan. The Liquidation Analysis is based on the value of the Debtor's assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date. Further, the analysis is subject to potential material changes, including with respect to economic and business conditions and legal rulings. The actual liquidation value of the Debtor could vary materially from the estimate provided in the liquidation analysis. Finally, the Liquidation Analysis does not include a liquidation analysis of the Debtor's Insurance Policies. This is so because, in light of insurer coverage defenses and defenses to Abuse Claims, the liquidation value of those policies is highly uncertain.

## XI.  CERTAIN FEDERAL INCOME TAX CONSIDERATIONS

THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE AMENDED PLAN ARE COMPLEX AND, IN MANY AREAS, UNCERTAIN. ACCORDINGLY, ALL HOLDERS OF CLAIMS ARE STRONGLY URGED TO CONSULT

THEIR TAX ADVISORS WITH SPECIFIC REFERENCE TO THE FEDERAL, STATE, AND LOCAL TAX CONSEQUENCES OF THE AMENDED PLAN. NEITHER THE DEBTOR NOR THE DEBTOR'S COUNSEL MAKE ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF CONFIRMATION AND CONSUMMATION OF THE AMENDED PLAN AS TO THE DEBTOR OR ANY CREDITOR.

The following summary is a general discussion of certain potential Federal income tax consequences of the Amended Plan. The summary is based upon relevant provisions of the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), the applicable Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authority, published rulings, and such other authorities considered relevant now in effect, all of which are subject to change.

The federal income tax consequences to any particular creditor may be affected by matters not discussed below. Furthermore, the summary does not address all categories of Creditors, some of which may be subject to special rules not addressed herein. There also may be state, local, or foreign tax considerations applicable to each Creditor or the Debtor.

### A. Tax Consequences To Creditors

A creditor that receives a distribution in satisfaction of its Claim will generally recognize a gain or loss in an amount equal to the difference between (i) the amount of cash received by such creditor in respect of its Claim (excluding any cash received in respect of a Claim for accrued interest) and (ii) the creditor's tax basis in its Claim. The character of any gain or loss recognized as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among other things, the tax status of the creditor, whether the Claim constitutes a capital asset in the hands of the creditor, whether the Claim has been held for more than one year, and whether and to what extent the creditor has previously claimed a bad debt deduction (or charged a reserve for bad debts) with respect to the Claim.

For example, if a distribution is made in satisfaction of a receivable acquired in the ordinary course of the Claimant's trade or business, and the Claimant had previously included the amount of such receivable Distribution in his or her gross income under his or her method of accounting, and had not previously claimed a loss or bad debt deduction for that amount, the receipt of the distribution should not result in additional income to the Claimant but may, as discussed below, result in a loss. Conversely, if the Claimant had previously claimed a loss or bad debt deduction with respect to the item previously included in income, the Claimant generally would be required to include the amount of the distribution in income when received.

The Debtor anticipates that distributions in satisfaction of Abuse Claims will, in all instances, constitute damages, other than punitive damages, on account of personal physical injuries and/or physical sickness, within the meaning of Section 104(a)(2) of Tax Code. The Debtor has not, however, fully analyzed such tax issues and cannot (and does not hereby) make any assurances or representations regarding the anticipated tax treatment of Abuse Claims.

THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCE TO EACH HOLDER OF AN UNSECURED CLAIM. FURTHERMORE, THE TAX CONSEQUENCES OF THE AMENDED PLAN ARE COMPLEX, AND IN SOME

CASES, UNCERTAIN. THEREFORE, IT IS IMPORTANT THAT EACH HOLDER OF AN UNSECURED CLAIM OBTAIN HIS, HER, OR ITS OWN PROFESSIONAL TAX ADVICE REGARDING THE TAX CONSEQUENCES TO SUCH HOLDER OF AN UNSECURED CLAIM AS A RESULT OF THE AMENDED PLAN.

## B. Tax Consequences To The Debtor.

### 1. Cancellation of Debt Income.

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (1) the adjusted issue price of the indebtedness satisfied, over (2) the sum of (a) the issue price of any new indebtedness of the taxpayer issued and (b) the fair market value of any new consideration (including any new equity or cash) given in satisfaction of such indebtedness at the time of the exchange.

Under Section 108 of the IRC, a taxpayer is not required to include COD Income in gross income if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that case (the "Bankruptcy Exception"). Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income. In general, tax attributes will be reduced in the following order: (a) net operating losses ("NOLs") (which, in the case of S Corporations, are based on current taxable year losses and losses that the S corporation's shareholders were unable to utilize in prior years); (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject (the "Liability Floor Rule")); (e) passive activity loss and credit carryovers; and (f) foreign tax credits; however, several of these categories do not apply to S corporations. Alternatively, the taxpayer can elect first to reduce the basis of its depreciable assets pursuant to Section 108(b)(5) of the IRC. Because the Amended Plan provides that Holders of certain Allowed Claims will receive their pro rata share of new debt, the amount of COD Income will depend on, among other things, the adjusted issue price of the new indebtedness. Certain of these figures cannot be known with certainty until after the Effective Date. Accordingly, the amount of COD Income the Debtor may incur, and resulting attribute reduction (including to the basis of the Debtor's assets), is uncertain, but in no event will the basis of the Debtor's assets be reduced below the amount determined in accordance with the Liability Floor Rule.

On the Effective Date or as soon as reasonably practicable thereafter (the "Issuance Date"), the Reorganized Debtor may issue one or more shares of preferred stock in the Debtor to render the Debtor ineligible to be an S Corporation; provided that such issuance shall not materially affect the recoveries to and treatment of Claims and Interests under the Amended Plan. As a result, the Debtor's taxable year will be bifurcated into two short taxable years. The first short taxable year will be treated as if the Debtor is an S Corporation (the "S Corp Taxable Year"). The Amended Plan ProponentsAmended Plan Proponents expect that S Corp Taxable Year will be treated as beginning on January 1, 20##, and ending on the day immediately before the Issuance Date. The second short taxable year will be treated as if the Debtor is a standard "C Corporation" (the "C

Corp Taxable Year"). The Amended Plan Proponents expect that the C Corp Taxable Year will be treated as beginning on the Issuance Date and ending on December 31, 20##.

Accordingly, the Amended Plan Proponents expect, but cannot guarantee, that (1) any COD Income resulting from the Amended Plan will be treated as having been realized during the S Corp Taxable Year, and (2) income or loss following the Effective Date will be treated as having been realized during the C Corp Taxable Year.

## 2. Limitation of Tax Attributes.

In general, the acquirer of an S corporation does not acquire any suspended losses that existed at the time of an acquisition. Additionally, to the extent any NOLs exist as of the Effective Date, the Amended Plan Proponents expect that such NOLs will be subject to reduction under Section 108 of the IRC. Accordingly, the Amended Plan Proponents do not expect that the Debtor will have any net operating losses or similar attributes (other than tax basis, as discussed above) that can be applied to income, if any, generated in the C Corp Taxable Year (or to any period thereafter).

## C. Certain United States Income Tax Consequences to Holders of Class 3 Claims and Class 4 Claims.

As an initial matter, the treatment of any such U.S. Holder will depend, in part, on whether the TruPS are determined to be stock or "securities". Whether a Claim that is surrendered and debt instruments received pursuant to the Amended Plan constitute "securities" is determined based on all the facts and circumstances. Most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for United States federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest in the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.

The character of any recognized gain as capital gain or ordinary income will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands (including whether the Claim constitutes a capital asset), whether the Claim was purchased at a discount, whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to its Claim, and whether any part of the Holder's recovery is treated as being on account of accrued but unpaid interest. Accrued interest and market discount are discussed below.

### 1. Consequences for U.S. Holders Receiving Senior and Junior TruPS

#### a. Treatment if the TruPS are Determined to be "Securities."

If a Class 3 or 4 Claim and the TruPS are determined to be "securities," then the exchange of such Claim for TruPS should be treated as a reorganization under the IRC. Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or original issue discount), a U.S. Holder of such Claim should not recognize gain or loss with respect to such exchange.

U.S. Holders should obtain a tax basis in the TruPS, other than any such amounts treated as received in satisfaction of accrued but untaxed interest (or original issue discount), equal to the tax basis of the surrendered Claim. The holding period for the TruPS should include the holding period for the surrendered Claims.

The tax basis of any TruPS determined to be received in satisfaction of accrued but untaxed interest (or original issue discount) should equal the amount of such accrued but untaxed interest (or original issue discount), but in no event should such basis exceed the fair market value of the TruPS received in satisfaction of accrued but untaxed interest (or original issue discount). The holding period for any such Amended TruPS should begin on the day following the Effective Date.

### b. Treatment if the TruPS Are Determined Not to Be "Securities."

Some of the Class 3 and 4 Claims may not be "securities." In such case, a U.S. Holder of such Claims will be treated as receiving its distributions under the Amended Plan in a taxable exchange under Section 1001 of the IRC. Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or original issue discount), each U.S. Holder of such Claim should recognize gain or loss equal to the difference between the issue price of the TruPS and such U.S. Holder's adjusted basis, if any, in such Claim.

U.S. Holders of such Claims should obtain a tax basis in the TruPS received, other than any such amounts treated as received in satisfaction of accrued but untaxed interest (or original issue discount), equal to the fair market value of the TruPS as of the date such property is distributed to the U.S. Holder. The holding period for the TruPS should begin on the day following the Effective Date.

The tax basis of any TruPS determined to be received in satisfaction of accrued but untaxed interest (or original issue discount) should equal the amount of such accrued but untaxed interest (or original issue discount), but in no event should such basis exceed the fair market value of the TruPS received in satisfaction of accrued but untaxed interest (or original issue discount). The holding period for any such TruPS should begin on the day following the Effective Date.

### 2. Accrued but Untaxed Interest

To the extent that any amount received by a Holder of a surrendered Allowed Claim under the Amended Plan is attributable to accrued but unpaid interest (or original issue discount) and such amount has not previously been included in the Holder's gross income, such amount should be taxable to the Holder as ordinary interest income.

Conversely, a Holder of a surrendered Allowed Claim may be able to recognize a deductible loss to the extent that any accrued interest (or original issue discount) on the debt

instruments constituting such Claim was previously included in the Holder's gross income, but was not paid in full by the Debtors.

The extent to which the consideration received by a Holder of a surrendered Allowed Claim will be attributable to accrued interest (or original issue discount) on the debts constituting the surrendered Allowed Claim is unclear. Holders of Claims with accrued interest (or original issue discount) should consult with their tax advisors regarding the allocation of the consideration.

### 3. Market Discount

Under the "market discount" provisions of Sections 1276 through 1278 of the IRC, some or all of any gain realized by a Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest," or (b) in the case of a debt instrument issued with "original issue discount," its adjusted issue price, by at least a *de minimis* amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the taxable disposition (determined as described above) of debts that it acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued). To the extent that the surrendered debts that had been acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property (as may occur here), any market discount that accrued on such debts but was not recognized by the Holder may be required to be carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument. These rules are complex, their application is uncertain, and Holders of Allowed Claims should consult their own tax advisors regarding their application.

### 4. Information Reporting and Backup Withholding

The Amended Plan Proponents will withhold all amounts required by law to be withheld from payments of interest (or original issue discount). The Amended Plan Proponents will comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim. Additionally, backup withholding, currently at a rate of 28 percent, will generally apply to such payments unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 or, in the case of Non-U.S. Holder, such Non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption). Any amounts withheld under the backup withholding rules will be allowed as a credit against such

Holder's federal income tax liability and may entitle such Holder to a refund from the IRS, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, U.S. Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Amended Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE AMENDED PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH A HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE AMENDED PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR NON-U.S. TAX LAWS, AND OF ANY CHANGES.**

## XII.   CERTAIN SECURITIES LAW MATTERS

### A.   TruPS.

The Amended Plan provides that Holders of certain Allowed Class 3 Senior TruPS Claims and Class 4 Junior TruPS Claims will receive their Pro Rata share of the Net Sales Proceeds under a Sale Transaction if the available Net Sales Proceeds are not sufficient to pay the Allowed amount of all Class 2, Class 3, and Class 4 Claims in full.

The Amended Plan Proponents believe that the Senior and Junior TruPS constitute "securities," as defined in Section 2(a)(1) of the Securities Act, Section 101 of the Bankruptcy Code, and applicable Blue Sky Law. The Amended Plan Proponents further believe that the offer and sale of the Senior and/or Junior TruPS pursuant to the Amended Plan are, and subsequent transfers of the Senior and/or Junior TruPS by the Holders thereof that are not "underwriters," as defined in Section 2(a)(11) of the Securities Act and in the Bankruptcy Code, will be exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code and state securities laws.

### B.   Issuance and Resale of Senior and Junior TruPS Under the Amended Plan.

#### 1.   Exemption from Registration.

Section 4(a)(2) of the Securities Act provides that the registration requirements of Section 5 of the Securities Act shall not apply to the offer and sale of a security in connection with transactions not involving any public offering. Transactions meeting the requirements of rule 506 promulgated thereunder by the SEC are deemed to qualify for the exemption provided for in Section 4(a)(2) without any need to examine any factors other than the requirements of rule 506.

By virtue of Section 18 of the Securities Act, Section 4(a)(2) also provides that any state Blue Sky Law requirements shall not apply to such offer or sale conducted in compliance with SEC rules or regulations issued under Section 4(a)(2), such as Regulation D promulgated under the Securities Act.

Each Holder of a Claim that is entitled to vote will be requested to make representations that are set forth in the Ballot regarding such Holder's qualifications to be an offeree in a private offering exempt from registration from the Securities Act by virtue of Section 4(a)(2) and that such Holder is an Accredited Investor. The Amended Plan Proponents are relying on section 4(a)(2) of the Securities Act, rule 506 of Regulation D promulgated under the Securities Act, and similar Blue Sky Law provisions, to exempt from registration under the Securities Act and Blue Sky Law the offer to the Holders of Senior and Junior TruPS.

Section 1145 of the Bankruptcy Code provides that the registration requirements of Section 5 of the Securities Act (and any state Blue Sky Law requirements) shall not apply to the offer or sale of stock, options, warrants or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property. The Amended Plan Proponents are relying on the exemption from the Securities Act, and equivalent state law registration requirements, provided by Section 1145(a) of the Bankruptcy Code, to exempt from registration under the Securities Act and Blue Sky Law the offer and sale of the TruPS under the Amended Plan.

In reliance upon these exemptions, the offer and sale of the Senior and Junior TruPS will not be registered under the Securities Act or any state Blue Sky Law.

Because the issuance of the Senior and Junior TruPS under the Amended Plan are covered by Section 1145 of the Bankruptcy Code, the Senior and Junior TruPS may be resold without registration under the Securities Act or other federal securities laws, unless the Holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in Section 2(a)(11) of the Securities Act and in the Bankruptcy Code. In addition, the Senior and Junior TruPS generally may be able to be resold without registration under state securities laws pursuant to various exemptions provided by the respective Blue Sky Law of those states; however, the availability of such exemptions cannot be known unless individual state Blue Sky Laws are examined. Therefore, recipients of the Senior and Junior TruPS are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state Blue Sky Law in any given instance and as to any applicable requirements or conditions to such availability.

## 2. Resales Of Senior And Junior TruPS; Definition of Underwriter.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; or (b) offers to sell securities offered or sold under a plan for the Holders

of such securities; or (c) offers to buy securities offered or sold under a plan from the Holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of Section 2(a)(11) of the Securities Act. In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of Section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under Section 1145(b)(1)(D) of the Bankruptcy Code, by reference to Section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in Section 2(a)(11) of the Securities Act, is intended to cover "controlling persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling Person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "controlling Person" and, therefore, an underwriter.

Resales of the Senior and Junior TruPS by Persons deemed to be "underwriters" (which definition includes "controlling Persons") are not exempted by Section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, Holders of Senior and Junior TruPS who are deemed to be "underwriters" may be entitled to resell their Senior and Junior TruPS pursuant to the limited safe harbor resale provisions of Rule 144. However, the Amended Plan Proponents do not presently intend to make publicly available the requisite current information regarding the Debtor, and as a result, Rule 144 may not be available for resales of Senior and Junior TruPS by persons deemed to be underwriters. Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling Person") with respect to the Senior and Junior TruPS would depend upon various facts and circumstances applicable to that Person. Accordingly, the Amended Plan Proponents express no view as to whether any Person would be deemed an "underwriter" with respect to the Senior and Junior TruPS. In view of the complex nature of the question of whether a particular Person may be an "underwriter," the Amended Plan Proponents make no representations concerning the right of any Person to freely resell Senior and Junior TruPS. **Accordingly, the Amended Plan Proponents recommend that potential recipients of Senior and Junior TruPS consult their own counsel concerning their ability to freely trade such securities without compliance with the federal and state securities laws.**

### C. No Listing of Senior or Junior TruPS.

The Reorganized Debtor will not be required to file periodic reports with the SEC following emergence. Moreover, the Reorganized Debtor will not seek to list the Senior or Junior TruPS on a national securities exchange.

## XIII. CONCLUSION AND RECOMMENDATION

The Amended Plan Proponents believe that confirmation and implementation of the Amended Plan is preferable to any other alternative. Accordingly, the Amended Plan Proponents urge all claimants entitled to vote to accept the Amended Plan by so indicating on their ballots and returning them as specified in the instructions set forth in the Solicitation Packages.

Respectfully submitted,

**CATHERINE STEEGE**, not individually but as chapter 11 trustee for **NORTHWEST BANCORPORATION OF ILLINOIS, INC.**

**AMERINATIONAL COMMUNITY SERVICES, LLC**

By: */s/ Catherine Steege*
One of Her Attorneys

By: */s/ Jay Jaffe*
One of Its Attorneys

Catherine Steege
Landon S. Raiford
JENNER & BLOCK LLP
353 North Clark Street
Chicago, Illinois 60654
Telephone: (312) 222-9350
csteege@jenner.com

Jay Jaffe
FAEGRE DRINKER BIDDLE &
REATH LLP
600 East 96th Street, Suite 600
Indianapolis, Indiana 46240
Telephone: (317) 569-9600
Jay.jaffe@faegredrinker.com

Dated: February 22, 2023